```
               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEBRASKA
```

| | | |
|---|---|---|
| CITY OF LINCOLN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:06CV3046 |
| | ) | |
| v. | ) | |
| | ) | |
| LINCOLN LUMBER CO., | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

INTRODUCTION

The defendant, Lincoln Lumber Company ("LLC"), timely removed this case from the County Court of Lancaster County, Nebraska pursuant to 28 U.S.C §§ 1331 and 1446. LLC claims the condemnation action filed by the City of Lincoln ("City") arises under the laws of the United States because the City "seeks to condemn property used in the railroad operations of LLC, which condemnation if allowed to proceed would prevent or unduly interfere with railroad operations and interstate commerce." Filing 7 (amended notice of removal), ¶ 3. LLC alleges this court has federal question subject matter jurisdiction because "[s]tate condemnation actions which prevent or unduly interfere with railroad operations are preempted by 49 U.S.C. § 10501(b), as broadened by the ICC Termination Act of 1995 (ICCTA)." Filing 7 (amended notice of removal), ¶ 3.

Pending before me is the City's motion for remand, filing 11.[1] The City argues that its authority to condemn this railroad

---

[1] The parties have voluntarily consented to have the undersigned magistrate judge conduct any and all proceedings in this case, including any trial and entry of final judgment. See filing 24, "Consent to Exercise of Jurisdiction by a United States Magistrate Judge," and 28 U.S.C. § 636(c).

property for the purpose of constructing a storm sewer was already litigated and decided in plaintiff's favor in <u>City of Lincoln v. Surface Transportation Board</u>, 414 F.3d 858, 863 (8th Cir. 2005). It claims the only remaining issue, the amount of compensation owed to the plaintiff for the taking, is not a federal question, and therefore no federal question jurisdiction exists. Filing 12 (plaintiff's brief) at 1-2.

SCOPE OF THE RELEVANT RECORD

The issue before me is whether this court has federal question jurisdiction; the merits of the case are not before me and should not be addressed until the court first determines that it has jurisdiction. Therefore, the initial question is whether the allegations of the City's condemnation petition raise a claim that "arises under" federal law. As summarized in <u>Phipps v. F.D.I.C.</u>, 417 F.3d 1006, 1010 (8th Cir. 2005):

> Removal based on federal question jurisdiction is usually governed by the "well-pleaded complaint" rule. <u>Krispin v. May Dep't Stores Co.</u>, 218 F.3d 919, 922 (8th Cir. 2000). This rule provides that federal jurisdiction may be invoked "only where a federal question is presented on the face of the plaintiff's properly pleaded complaint." <u>Id</u>. The rule also "makes the plaintiff the master of the claim," allowing the plaintiff to "avoid federal jurisdiction by exclusive reliance on state law." <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987).

<u>Phipps</u>, 417 F.3d at 1010.

However, where removal is based federal question jurisdiction, 28 U.S.C. § 1441, a federal claim is raised not

only when the well-pleaded complaint establishes that "federal law creates the cause of action," but also when the "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law," or the plaintiff has raised a claim that is completely preempted by federal law. Lundeen v. Canadian Pacific Ry. Co., 2006 WL 1319983, *1 (8th Cir., May 16, 2006)(quoting Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983) and citing Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536, 542 (8th Cir. 1996)).

LLC's notice of removal raises preemption as the basis for federal question jurisdiction. As such, the plaintiff's "Petition for the Appointment of Appraisers and Condemnation of Lands" presents a federal claim if the federal statutory and regulatory laws, which govern the use of property for railroad operations and vest the Surface Transportation Board with administrative authority over such uses, completely preempt the City's pending state law condemnation action.

The court's determination of federal question jurisdiction is usually based solely on its review of the plaintiff's complaint. However, the City and LLC have each submitted evidence concerning prior litigation between these parties regarding the land at issue, the rulings of the Surface Transportation Board ("STB") and the Eighth Circuit, and the underlying facts.[2]

---

[2] With the exception of the defendant's supplemental reply brief, filing 23, the parties have not briefed whether complete preemption under 49 U.S.C. § 10501(b) effectively converts the City's condemnation action into a claim arising under federal law, or whether any preemption under 49 U.S.C. § 10501(b) provides only a defense to the claim. Instead, the parties' briefs and evidentiary submissions focus on whether the defendant is barred by res judicata and collateral estoppel from claiming

3

It is within the court's discretion to determine how to proceed on jurisdictional questions, and the court "may consider materials outside the pleadings such as depositions or affidavits in determining whether the record demonstrates lack of subject matter jurisdiction." Satz v. ITT Financial Corp., 619 F.2d 738, 742 (8th Cir. 1980). See also Land v. Dollar, 330 U.S. 731, 735 & n. 4 (1947); Western Nebraska Resources Council v. Wyoming Fuel Co., 641 F.Supp. 128, 139 (D.Neb. 1986)(Urbom. J.).

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction--its very power to hear the case--there is a substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims.

Western Nebraska Resources, 641 F.Supp. at 139.

Upon review of the parties' submissions, I conclude the evidence submitted by the parties may assist the court in

---

the City's condemnation action is federally preempted. Res judicata and collateral estoppel govern a party's right to litigate or re-litigate the merits of a case, and are generally raised as affirmative defenses to a claim. Here they are raised by the City to bar the defendant from claiming the condemnation action is subject to the exclusive jurisdiction of the Surface Transportation Board and therefore raises a federal question.
   This memorandum and order concludes that no federal question jurisdiction exists. However, to reach that conclusion, I need not and have not addressed the merits of the plaintiff's res judicata and collateral estoppel claims. Res judicata and/or collateral estoppel may be relevant to the underlying merits of this case, but this court has no subject matter jurisdiction over the merits. Therefore, the res judicata and collateral estoppel claims should be, and have been, reserved for determination by the state court upon remand.

assessing whether the plaintiff's condemnation petition, which appears to raise only a state law claim, actually alleges a claim arising under federal law.  I have therefore considered the evidence submitted by the parties; not for the purpose of deciding if the defendant is barred from re-litigating certain issues in this case, but to decide whether the case as pleaded actually arises under federal law.

## STATEMENT OF FACTS

The plaintiff's state petition alleges an eminent domain proceeding against the defendant.  The City claims it is entitled to obtain a permanent easement and temporary construction easement across the defendant's real property to construct, install, operate, and maintain a storm sewer.  The real estate at issue is a railroad right-of-way.  The City alleges that its acquisition and use of the permanent easement will "not divest the record owner of the real property of the title or ownership of the rights to use and enjoy the above-described property for railroad purposes . . . ."  Filing 7, attachment 1 (petition) at p. 5.

As early as February 2002, the City advised LLC of its intent to install an underground storm sewer within LLC's railroad right-of-way.  Filing 17, Hamill affidavit, ex. K (Hamill letter).  LLC advised the City that it intended to move the railroad tracks on the 18th to 24th street right-of-way to the south side of the land, and then build buildings on the land to house building materials.  LLC advised the City by letter that it was concerned that the storm sewer project would disrupt LLC's long-term business plans because once a storm sewer was constructed on the property, the City would deny permit requests

5

for constructing buildings on top of the storm sewer easement. LLC's letter further requested a total and complete release of liability for anything related to the existence and construction of the storm sewer on its property. The letter did not mention concern that railroad service would be disrupted by the storm sewer project. Filing 17, Hamill affidavit, ex. K (Hamill letter). The proposed route for the storm sewer remained unknown as of February 2002. Filing 17, Hamill affidavit, ex. K (Hamill letter).

In November 2002, the City filed a Petition for a Declaratory Order with the STB seeking "a declaratory order determining that the acquisition of certain limited portions of a railroad corridor owned by Lincoln Lumber Company . . . does not constitute either an acquisition or an abandonment/discontinuance of operations for which prior Board approval is required under 49 U.S.C. §§ 10901-03." Filing 13, ex. 1 (Pederson affidavit), attachment A (Petition for Declaratory Order), p. 1. The City's STB petition stated it was attempting to acquire limited portions of a five-block railroad corridor in Lincoln, Nebraska owned by the LLC for a pedestrian and bike trail (the "Husker Link Trail") and for a storm drainage system improvement. Filing 13, ex. 1 (Pederson affidavit), attachment A (Petition for Declaratory Order), p. 2.

As of November 2002, the City had provided LLC with information generally explaining the proposed route of the storm sewer construction. The City intended to install the storm sewer underground within LLC's railroad right-of-way and south of its rail line. The City had also advised LLC that the storm sewer project would require temporary construction easements for work performed south of the main track and under a spur track, and to

permit track crossings at 22nd, 23rd, and 24th Streets. Filing 17, Hamill affidavit, ex. C (Schuchmann STB statement) ¶¶ 2, 14. The City's attorney represented to STB that "[t]he storm sewer is currently planned on the south side of the rail to match best practices and avoid boring under the tracks." Filing 17, Hamill affidavit, ex. F (Pederson STB statement), ¶ 4.

However, during the course of the proceedings before the STB, the precise construction plans for the storm sewer were only "90% complete," still in draft form, and therefore subject to change. Filing 17, Hamill affidavit, ¶ 16; ex. E (Kramer STB statement), ex. 1; ex. L (Hamill notes). The City had not surveyed LLC's land or performed any other non-intrusive examinations in anticipation of any construction because, although LLC said it supported the storm sewer project, it refused to cooperate with the City's request for access to LLC's land unless the City agreed not to construct the Husker Link Trail Project. Filing 17, Hamill affidavit, ex. E (Kramer STB statement), ¶ 6; ex. F (Pederson STB statement), ¶¶ 6-9. LLC's president "[m]ade it clear that he supported the storm sewer project and noted 'that would help a lot of people,' but he linked approval of the storm sewer acquisition to keeping the trail off [LLC's] property." Filing 17, Hamill affidavit, ex. F (Pederson STB statement), ¶ 8; ex. J (Hamill notes).

In support of its STB petition, the City stated construction of the sewer project would cause LLC's spur track to be out-of-service for about one week (and possibly less with advance planning), but that railcar loads received by LLC could be unloaded from the main track during this brief period of time. The City also advised the Board that LLC's railcar volume on the track was low (approximately only fifty cars a year), and

evidence from the City's experts stated construction of the storm sewer would not burden LLC's rail service.  Filing 17, Hamill affidavit, ex. C (Schuchmann STB statement), ¶ 25; ex. E (Kramer STB statement), ¶ 5.  The City assured the Board and LLC that it would work with LLC in designing and constructing the storm sewer in order to minimize any interference of LLC's railroad operations caused by the existence and construction of the storm sewer.  Filing 17, Hamill affidavit ¶ 16, & ex. E (Kramer STB statement), ¶ 4-5.

Don Hamill ("Hamill"), president of LLC, reviewed the City's STB petition and accompanying evidence, and noted that these documents referred to the City's "current" plans, meaning the plans could still be changed.  Hamill further noted his belief that it was impossible to install a storm sewer and bike trail on the right-of-way without interfering with rail operations. Filing 17, Hamill affidavit, ex. J (Hamill notes).  However, LLC's filed response to the City's STB petition objected only to construction of the bike trail.  The response stated:

> LLC is not opposed to the City's proposal for improvement to the storm sewer, assuming adequate compensation is paid for taking the land.  While the project would be temporarily disruptive during construction, the sewer, being underground, would have minimal effect on safety and rail utilization of the surface of the ROW.
>
> LLC is opposed to the proposal for a trail in any segment of the rail line ROW.

Filing 13, ex. 1 (Pederson affidavit), attachment D (LLC's Reply in Partial Opposition to Petition for Declaratory Order), p. 3.

On August 11, 2004, the STB issued a decision in favor of the LLC regarding the proposed bike trail.  The STB found that

LLC was currently using the right-of-way to move freight, store lumber, unload railroad cars, and stage unloaded freight for further movement into shipper facilities, and it intended to rebuild a sidetrack and construct a terminal facility. The STB concluded these activities were part of transportation by rail as defined in 49 U.S.C. § 10102(9), the proposed trail could interfere with these transportation activities, and the City had not adequately refuted LLC's contentions that the trail would create safety hazards. Filing 17, Hamill affidavit, ex. A (STB decision). The STB decision did not specifically state a ruling regarding the sewer project.

The STB decision was appealed to the United States Court of Appeals for the Eighth Circuit. The City requested reversal of the STB's decision regarding the trail, and clarification of the its ruling regarding the storm sewer project. <u>City of Lincoln v. Surface Transp. Bd</u>., 414 F.3d 858, 860 (8th Cir. 2005). The STB's responsive Eighth Circuit brief explained that since LLC did not object to the storm sewer project, there was no dispute with regard to the City's proposed subsurface sewer easement, and therefore the STB was not required to issue a ruling on the proposed underground sewer project. Filing 17, Hamill affidavit, ex. I (STB Eighth Circuit brief), pp. 33-34.

On July 12, 2005, the Eighth Circuit affirmed the STB decision and, with regard to the storm sewer issue, held:

> Lincoln acknowledges that LLC has stated on the record that it does not oppose the project, but it seeks a remand and a ruling that the condemnation for the storm sewer will not be an acquisition or abandonment of a rail line for purposes of 49 U.S.C. §§ 10901-10903. The Board responds that there was no need to rule on that project because there was no dispute and that it is well established that nonconflicting, nonexclusive

> easements across railroad property are not preempted if they do not hinder rail operations or pose safety risks. To the extent that the Board's intentions were ambiguous, they have now been clarified, making a remand unnecessary.

City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 863 (8th Cir. 2005).

The City promptly submitted proposed deeds to LLC for the grant of a temporary construction easement and a permanent easement for the storm sewer project. Filing 17, Hamill affidavit, ¶¶ 17-18; exs. M & N. These deeds were not executed. The City and LLC entered into negotiations for the storm sewer easements, and during those discussions, LLC expressed its concerns regarding the "detrimental impact of the storm sewer project as proposed on the LLC's railroad operations, including interference and safety issues," and "requested that the Plaintiff consider some changes to the storm sewer plans to alleviate railway interference and safety issues." Filing 17, Hamill affidavit, ¶ 29. According to LLC, the City's legal department "flatly refused to consider any changes to the storm sewer project plans." Filing 17, Hamill affidavit, ¶ 30. According to the City, its plans for the storm sewer project have not changed since it filed the STB petition. Filing 13, ex. 2 (Higgins affidavit).

In February 2006, LLC submitted a proposed agreement to the City which set forth "LLC's requested terms for the temporary and permanent easements." Filing 17, Hamill affidavit, ¶ 19 & ex. O. The City did not sign LLC's proposed agreement, but instead countered with a redlined version of the agreement identifying the City's proposed deletions, additions, and changes. Filing 17, Hamill affidavit, ¶ 20 & ex. P. According to LLC, the City's

counterproposal "deleted provisions requested by LLC to help minimize railroad interference and safety issues LLC had previously discussed with Plaintiff's agents, including provisions that were consistent with representations Plaintiff had made to LLC and the STB prior to and during the STB proceedings." Filing 17, Hamill affidavit, ¶ 20; ex. P.

Accordingly, the core dispute pending between the parties regarding alleged "railroad interference and safety issues" are identified in the redlined portions of the City's counterproposal. Filing 17, Hamill affidavit, ex. P. The issues in dispute can be summarized as follows:

- As to the storm sewer construction itself, the parties dispute whether the City is required to:

    1) "replace" rather than "restore" any track removed or disturbed "to a condition fully equal to that existing before said work commenced," (filing 17, Hamill affidavit, ex. P. ¶ 6);

    2) remove the water inlet currently located near LLC's railroad switch at the City's expense, (filing 17, Hamill affidavit, ex. P. ¶ 10);

    3) install the sewer line three feet below the frost line, (filing 17, Hamill affidavit, ex. P. ¶ 11);

    4) complete the project within LLC's specified timetable, rather than the 120 calendar days proposed by the city, (filing 17, Hamill affidavit, ex. P. ¶ 12); and

    5) use a subcontractor experienced in working with railroad beds and tracks to do the work. Filing 17, Hamill affidavit, ex. P. ¶ 6)

- As to construction of retaining walls, the parties dispute whether the City must allow LLC to install the

> wall immediately, or before the City begins installing the storm sewer; and whether LLC must obtain city approval and permits for the design, location, and construction of the retaining wall.

- LLC's proposal requires the City to contractually indemnify LLC for damages related to the retaining wall construction, the abandoned storm sewer under LLC's property, any environmental contamination resulting from the storm sewer construction, and any property damage and bodily injury claims related directly or indirectly to the sewer line construction.  The City will not agree to these written indemnification provisions, and instead proposes to require the contractor performing the construction to carry a Railroad Protective Liability Insurance policy with $2,000,000 per occurrence, and $6,000,000 aggregate limits for coverage of property and bodily injury claims.

- Concerning a cement loading dock currently located above the previously buried sanitory sewer line, LLC claims that if it is necessary to remove the dock to repair or maintain that line, the City must pay the expense.  The City disagrees.

                         LEGAL ANALYSIS


     "A defendant may remove a state law claim to federal court when the federal court would have had original jurisdiction if the suit originally had been filed there."  Phipps, 417 F.3d at 1010 (citing 28 U.S.C. § 1441(b)).  See also, City of Chicago v. International College of Surgeons, 522 U.S. 156, 163 (1997).  A

defendant opposing remand bears the burden of establishing that federal subject matter jurisdiction exists over the plaintiff's case.  Green v. Ameritrade, Inc., 279 F.3d 590, 596 (8th Cir. 2002).  If the defendant proves that any claim within the plaintiffs' complaint supports federal question jurisdiction, the defendant may remove the entire case to federal court, including any alleged state-law claims arising from the same core of operative facts.  See 28 U.S.C. § 1367; City of Chicago, 522 U.S. at 164; Phipps, 417 F.3d at 1010 (citing Gaming Corp., 88 F.3d at 543).  However, all doubts as to the propriety of exercising federal jurisdiction over a removed case must be resolved in favor of remand.  Transit Cas. Co. v. Certain Underwriters at Lloyd's of London, 119 F.3d 619, 625 (8th Cir. 1997).

"Congressional intent is the 'ultimate touchstone' guiding preemption analysis."  Lundeen, 2006 WL 1319983, *1(citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987)).  If a statute contains an express preemption clause, then the statute's plain meaning is the best evidence of Congress' preemptive intent.  Lundeen, 2006 WL 1319983, *1 (citing Peters v. Union Pac. R.R., 80 F.3d 257, 261 (8th Cir. 1996)).  LLC claims the City's proposed storm sewer project will interfere with LLC's railroad operations, and therefore the project is subject to the federal law set forth in the Interstate Commerce Commission Termination Act of 1995, codified at 49 U.S.C. §§ 10101, et seq., (the "ICCTA").

Therefore, to determine whether the doctrine of complete preemption applies to the ICCTA and preempts the City's state law claims in this case, the court must examine the language of the statute and recent case law to decide whether the ICCTA so pervasively occupies the field of railroad governance that a

competing state law claim necessarily invokes federal law, and determine whether the City's state condemnation action competes with or stands as an obstacle to purpose of the ICCTA. Cedarapids, Inc. v. Chicago, Central & Pacific R. Co., 265 F.Supp. 2d 1005, 1011 (N.D. Ia. 2003). See also Commonwealth of Pa. v. Nelson, 350 U.S. 497, 502-05 (1956). Pursuant to 49 U.S.C. § 10501(b), the Surface Transportation Board[3] has "exclusive" jurisdiction over:

> (1) transportation by rail carriers and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, facilities of such carriers; and
>
> (2) the construction, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located or intended to be located, entirely in one state. . . .

49 U.S.C. § 10501(b). The remedies provided under the ICCTA "with respect to regulation of rail transportation are exclusive

---

[3]As explained in Iowa, Chicago & Eastern R.R. Corp. v. Washington County, Iowa, 384 F.3d 557, 558-59 (8th Cir. 2004):
> Congress established the Interstate Commerce Commission in 1890, giving it broad authority to regulate many facets of the railroad industry, a major component of the nation's interstate transportation network. Ninety years later, to reverse the industry's severe decline, Congress in the Staggers Act of 1980 significantly reduced the ICC's regulatory authority. In 1995, convinced that even greater deregulation was needed, Congress enacted ICCTA, terminating the ICC altogether. ICCTA transferred essential ICC regulatory functions to the Surface Transportation Board (STB), a quasi-independent three-member body within the Department of Transportation. See 49 U.S.C. §§ 701-703.

and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).  Rail "transportation," as used in the ICCTA, means:

> (A)  a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B)  services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C.A. § 10102(9)(A) & (B).

Under the express terms and plain meaning of 49 U.S.C. § 10501(b), the preemptive force of the ICCTA extends only to the regulation of rail "transportation."  In accord with this interpretation, the STB itself recognizes the limits of ICCTA preemption, and has held:

> The Federal preemption provision contained in 49 U.S.C. 10501(b), as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995), protects railroad operations that are subject to the Board's jurisdiction from state or local laws or regulations that would prevent or unreasonably interfere with those operations. . . .  But this broad Federal preemption does not completely remove any ability of state or local authorities to take action that affects railroad property.  To the contrary, state and local regulation is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety. . . .  Thus, acquisition of an easement by eminent domain to permit a crossing of railroad track in connection with construction of a new public street would not implicate the Federal preemption of 49 U.S.C. 10501(b) unless it would

>  prevent or unreasonably interfere with railroad operations.
>
>  [N]either the court cases, nor the Board's precedent, suggest a blanket rule that any eminent domain action against railroad property is impermissible. Rather, routine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, <u>sewer crossings</u>, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks.

<u>Maumee & Western Railroad Corporation and RMW Ventures, LLC-Petition for Declaratory Order,</u> 2004 WL 395835, *1-2 (S.T.B. March 2, 2004)(emphasis added)(internal citations omitted). <u>Maumee</u> held that the STB did not have exclusive jurisdiction over, and the ICCTA did not preempt, a city's local condemnation proceeding to acquire an easement to construct an at-grade road crossing over, and install subsurface utilities under, the main line of an active right-of-way.  See also <u>Florida East Coast Ry. Co. v. City of West Palm Beach</u>, 266 F.3d 1324 (11th Cir. 2001)(holding that enforcement of city's zoning and licensing ordinances against railroad's lessee was not preempted by ICCTA where the lessee used the property for non-rail transportation purposes; enforcing the ordinances did not impact or effectively govern rail transportation); <u>District of Columbia v. 109,205.5 Square Feet of Land</u>, 2005 WL 975745, *3 (D.D.C. 2005)(remanding state eminent domain action to state court for lack of federal question jurisdiction where the railroad failed to show that use of its right-of-way for a bike trail would interfere with railroad operations); <u>Dakota, Minn. & Eastern R.R. Corp. v. South Dakota</u>, 236 F.Supp. 2d 989, 1009 (D.S.D. 2002), vacated in part on other grounds, 362 F.3d 512 (8th Cir. 2004)("[T]he Court finds that Congress did not intend to preempt the field of eminent domain in enacting the ICCTA.").

Accordingly, the question before me is whether condemnation of an underground easement on LLC's right-of-way land for the storm sewer project will potentially impede rail operations or pose an undue safety risk. If so, the state condemnation action will undermine and potentially conflict with the STB's exclusive jurisdiction to regulate rail transportation, and this court has federal question jurisdiction because the state law claim is completely preempted by federal law; if not, this court has no jurisdiction and the case must be remanded to the state court.

The dispute between LLC and the City over the terms of insurance coverage and written indemnification provisions involves allocation of risk, not the regulation of rail transportation. There is nothing in the record to explain how the timing and cost for installing retaining walls, or the allocation of costs for removing a cement loading dock located above the previously buried sanitary sewer line, will in any way impact or impede LLC's use of the land for rail transportation. LLC has not explained how the distinction between "replacing" rather than "restoring" its tract "to a condition fully equal to that existing before said work commenced" will affect its continued use of the track for rail transport, nor has it produced any evidence that removing the water inlet located near LLC's railroad switch at the City's expense and requiring installation of the sewer line three feet below the frost line will affect rail transportation on the right-of-way. Though LLC may be claiming the City must comply with LLC's timetable for completion and should hire only subcontractors experienced in working with railroad beds and tracks, it is questionable whether these issues are really in dispute, and the possible impact of the projects' timing and the contractor's experience level on

17

rail transportation is too speculative to vest this court with federal question jurisdiction.

Underlying LLC's current dispute is one highly persuasive and undisputed fact: LLC represented to the STB that it "is not opposed to the City's proposal for improvement to the storm sewer, assuming adequate compensation is paid for taking the land," and that "[w]hile the project would be temporarily disruptive during construction, the sewer, being underground, would have minimal effect on safety and rail utilization of the surface of the ROW." Filing 13, ex. 1 (Pederson affidavit), attachment D (LLC's Reply in Partial Opposition to Petition for Declaratory Order), p. 3. The proposed construction specifications for installing the storm sewer have not changed since that statement was made. LLC's current dispute with the City appears to be primarily focused on allocating any risk related to the storm sewer and retaining wall construction, and imposing responsibility on the City to repair, remove, or perhaps even upgrade, existing structures on the LLC's land. These disputes can be raised and resolved in the state court action; they do not present a federal question.

LLC removed the City's condemnation action to federal court and therefore bears the burden of establishing federal subject matter jurisdiction. <u>Green</u>, 279 F.3d at 596. Based on the record before me, I conclude the LLC has failed to prove that the City's claim, or any part of it, is preempted by the ITTCA. Absent ITTCA complete preemption, no federal question jurisdiction exists and this case must be remanded to the County Court of Lancaster County, Nebraska.

IT THEREFORE HEREBY IS ORDERED:  The plaintiff's motion to remand this case to the County Court of Lancaster County, Nebraska, filing 11, is granted.

DATED this 23rd day of May, 2006.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge

19